May it please the Court, Daniel A. McDaniel of Stockton, California on behalf of the Central Delta Parties. This case, despite all the complications that may appear in it, is really a relatively simple case. It involves whether or not Congress intended that the 800,000 acre feet of water that it wanted devoted to fish and wildlife would be in addition to the existing requirements under the law. And we think that it's quite clear that indeed the law does provide that first the project should be operated according to all the existing obligations under state and federal law at the time of the enactment of the Central Valley Project Improvement Act in 1992, and that the 800,000 was to be an augmentation in addition to what was to be provided. Now, the Bureau has come up with a plan to implement the Central Valley Project Improvement Act. Why should we decide the legal questions where the water isn't too salty now, it hasn't been too salty, no indication it's going to be too salty any time soon, and the agency recognizes that it has the authority to do something about it if it does get too salty? Because there is a credible threat that, in fact, if the Bureau continues with this plan, it will end up with salinity, with Fresnella standard violations. In fact, the majority of the years that were modeled during the dry years, and that's when all of this becomes critical, is during the dry years, in fact there were multiple failures that would occur. So there is a very real and serious threat that, in fact, there will be a violation of the standard. I know that's enough for standing under, you have a case, Central Delta Water Agency, but does it give you a genuine issue of fact about whether they violated the act, even if the act is as you've interpreted it? I haven't seen anything that would indicate that the standard should be any different in evaluating whether or not there's a realistic threat that the violation may occur. You know, I freely admit I'm not completely clear yet on what the USBR's purchases are all about. Could you explain that to me? I mean, I've read this until my eyes are falling out, and I don't quite understand what these purchases are and how they play into the whole equation. Yes, the Bureau purchases water from some of the irrigation districts that are along the San Joaquin River, the tributaries to the San Joaquin River, Merced Irrigation District, the Turlock Irrigation District, all of the members of the San Joaquin River Group, who is a party to this action, as well as those districts, and those purchases are to assist in implementing the goals of the Central Valley Project Improvement Act. And when those purchases are made and the flows are released in accordance with those purchases, it takes water out of the system later on in the year, in the summertime, in order to provide those there's a greater likelihood of a water quality violation. When the water is purchased from the irrigation districts in pursuit of the CBP plan, where does it go? It goes into the river, but what's critical is it goes into the river in April and May, and in October. So it's a timing issue, then? Exactly, it's a timing issue. That's what was not clear to me. It's just a timing issue. It's that shift in the timing that has the adverse impact on the central delta parties. You don't believe, do you, that the government is not concerned at all times about the amount of salt in the water? I'm not sure I understand the question, Your Honor. Well, this is a question about salt in the water. And my question to you is, do you think the government is unconcerned about that problem? No, I don't believe they're unconcerned about that problem. They monitored it carefully? I think they... So far, there hasn't been any problem? And you're only worried about the problem occurring in the future? It's not entirely true that there hasn't been any problem. For one thing, there has been problems in the early 1990s. But since 95? Since 95, there hasn't... You have a slide that says there have been 21 purchases that violate the timing problem that you talk about with no harm at all? Right. But during that period of time, we've had the benefit of very good water years. We've had plenty of water... Their point is, you're speculating. And even the past, other than some modeling projections, don't support your concerns. That's exactly what Congress did when it enacted the CVPIA, and it directed Congress to look specifically at the worst seven-year period of drought in California's history, the 1928 through 1934 period. Congress was engaging in that same anticipation, I would call it, would be a better word than speculation. We know that a drought sooner or later will happen. It's just a matter of time, and that's why multi-year planning is so important in the operation of the district. That's why the Bureau comes up with a plan. I don't want to make light of this at all, because I understand the interests that are very important, but this is not purchases of water that they're releasing for water skiers. They're releasing it in pursuit of one of their obligations under the plan. Isn't that right? Yes, they are releasing it. They have all these balls in the air, agricultural and wildlife and fish. I mean, there's everything that they're trying to balance out. They have a reason that falls within the implementation of the plan for making these purchases and for the timing of the release, is the point I'm trying to make. Am I right? Yes, Your Honor. I do believe that they have a plan that they have to operate under. They have to make the thing work. There's no question that they are the entity, the agency, that's charged with that responsibility. But I do believe that Congress gave some overall direction and was apparently dissatisfied with the operation of the Bureau up to that point in time and determined that it needed to pass the Central Valley Project Improvement Act for the benefit of the fish and wildlife and for the benefit of maintaining the delta and the estuary and for the purpose of requiring the project to comply with the existing law. If we were to agree with you and rule along the lines of everything that you request, wouldn't this not put handcuffs on the other side in terms of respecting its other responsibilities other than the salinity standard? I would need to know more about what other responsibilities the Court is referring to. Hold on. You're trying to lock up a certain percentage or feet of water to make sure that your interest is respected. Would this not impair the requirement that they have to respect the other interests that are involved? No, I don't believe it would, Your Honor, because they can go elsewhere for the releases of the 800,000 acre feet of water. They don't have to take it all or I'm sorry, not all of it, but they don't have to take such a substantial portion of it from the New Maloney's project when New Maloney's is the last opportunity for them down the way to influence Vernalis water quality. That's the factual setting that the project is operating in. New Maloney's and the Stanislaus River is close to Vernalis and they use water from that project for water quality purposes. I'm having trouble. You better educate me. I was thinking that the issue is does the Bureau first take at least 800,000 acre feet off the top for the fish and then use what's left for the irrigation districts or does it first assure that the salinity standards are made for the irrigation districts under all circumstances and then take water for the fish, but I'm not clear on whether that's really the question or whether the question is between irrigation districts. Educate me. I think the Act requires that the pre-1992 obligations be satisfied and I believe that that's at the heart of our case is that those obligations have to be satisfied first. This is why I'm having trouble understanding. I'm asking about New Maloney's versus Vernalis versus the fish and you're talking about 92 Act and obligations. I'm sorry. And I'm having trouble connecting the general conceptual discussion with the facts of the case. One of the requirements in 1992 was the obligation of the Bureau to comply with the Vernalis salinity standard. That was something in effect and that's what Congress said is you shall begin as of that day operating the project in accordance with all of the existing legal obligations that you have and then after that add 800,000 acre feet that we want applied to the benefit of fish and wildlife for the restoration of fish and wildlife and then after that I would say that if there's water remaining, that water can be provided to contractors. See actually you're seeking an injunction but actually you're asking that we place the government in receivership because the Acts change, water changes so rapidly in there and in order to make the injunction that you seek valid based upon certain circumstances, we would have to place the government under receivership. I think that would be completely unnecessary because I think things change so rapidly, counsel. What we're talking about is planning and allocation and that's what got us here in the first place was the government's plan and allocation was not to meet the pre-existing obligations and then use some water from that project to meet the 800,000 acre feet. The plan that the government came up with was a plan to say we want to put new Maloney's water to work and we want to take away from all the pre-existing obligations in order to provide that water from the project. I think all the court would be required to do is direct the Bureau to comply with the requirement of the CVPIA that allocations and planning provide for the satisfaction of the pre-existing 1992 obligations and then apply water for the benefit of fish and wildlife. You're seeking an injunction as riparian owners. What rights do riparian owners have in this case? A riparian has a right to as much of the water as is reasonably necessary. It's a correlative right and it's water that's flowing by him. That's basically the riparian's right now. Many of the people within the two districts and one of the plaintiffs in this case in fact has appropriative rights as well. Do you allege that? Yes. In fact, it was part of our motion for summary judgment. We demonstrated what water appropriation permits there were. I think we attached them as exhibits as well. How much water do you claim is appropriated? How much water do you claim that they appropriated? By Alexander Hildebrand. Any measure that you want. What I'm struggling with, Your Honor, is... It's your phrase that they have appropriated water rights. My sole question to you is just as simple, what's the extent of the appropriation? I can't tell you exactly what the amount is. It's in the record though in the permits, the second feet that are permitted to be appropriated as far as the appropriative rights that we tendered. The second thing I don't completely understand is the impact of the State Water Resources Control Board cease and desist order information we've been getting. On March 29, you sent us a CDO cease and desist order document dated February 15, 2006 that seems to say that the somebody is threatening the salinity standard and so we're going to do something about it permit-wise. What's the impact of this document that I'm showing you? I think what it shows, Your Honor, is that there's still a need for the Court to be concerned despite the fact that there have been these years that we've benefited from recently of good rainfall, but the Bureau has still been, as you can see from that order, has not been doing the monitoring that was required. In fact, one of the, or at least two of the required stations where they're required to comply with the water quality control is they've actually violated it and didn't report it. So, I mean, it... Well, again, I'm not quite sure I understand the impact of this. Have you won your case in front of the State Water Resources Control Board by getting a cease and desist order? You and your interests. I would say that there was success in front of the State Water Resources Control Board as far as that order is concerned, but that doesn't take care of us as far as the Central Valley Project Improvement Act is concerned. But isn't it the same thing? I mean, these aren't rhetorical questions. You laid this on us. I get it this morning. I read it as quickly as I could and I'm not quite sure I understand how it fits into the picture. That's what I'm asking. I'll ask the other side the same thing because they sent us one of these, too. I received a copy of the recent State Board case and the coordinated cases that was issued by the State Court of Appeal from Counsel for the Government. In part, my tendering of that order is in response to that order. The State Court order was placed before the court. I felt that it was appropriate to place this order before the court because it shows what's going on most recently as far as water quality. I'm just really at odds with what to do with this thing. The State Water Board finds there is a threat that the DDR, Department of Water Resources, and the United States Bureau of Reclamation will violate their permit license conditions. And then it talks about San Joaquin, Old River near Middle River, Old River at Tracy Bridge. But there's no current threat on the San Joaquin Valley at Vernalis. But then they go to issue a CDO with respect to future violations. Arch, is this a CDO that stops the other side from doing what you claim that they're doing in connection with the salinity standard? What does this mean? No. It doesn't stop them. First of all, the CDO applies to three stations, what I'll call interior monitoring stations, below Vernalis. They say there's no threat of violation at Vernalis. Right. So what does that mean? That means... I just don't know what any of this means and what we're supposed to do with it. What that means is that the Bureau is, during these most recent years, that they are making the claim that there's been no violation, that everything's rosy and nobody needs to worry about doing anything because we promise that we will comply. Here there have been problems in the very recent past. So this is just facts that relate to the issues at hand or summary judgment? Yes. I think it's just more current information on what's going on. Trying to augment the factual record? I think that would be a fair statement, Your Honor. Okay. So the real, the only significance of the cease and desist order is that if the case went back to the district court, there might be additional evidence to show a genuine issue of material theft. That's correct, Your Honor. I'd like to reserve... It's kind of irregular to try to increase the factual record at the appellate level, but we now understand what you're trying to do. Thank you, Your Honor. Thank you, Counsel. May it please the Court, I am David Shilton from the Department of Justice, representing the Bureau of Reclamation. With me at counsel table is Tim O'Loughlin, representing the We agree with the first premise that counsel stated, which is that when Congress imposed these new obligations in 1992, that it intended that the Bureau fulfill its earlier obligations, such as the permit conditions. The question here is, what are those obligations? What do they require? With respect to salinity control, this permit condition on the Bureau's permit for New Jerusalem requires that it release water from the dam to meet a certain monthly standard at Vernalis, and it has been doing that successfully since 1995. There is no additional requirement imposed by the 1992 Act, by the permit or otherwise, that pertains to how the Bureau plans to meet this standard in the future. There is no requirement for it to set aside or dedicate water at New Malonis Reservoir so that it can guarantee that several years in the future it will always be able to meet that requirement. As has been observed, the Bureau has a lot of balls that it has to juggle. It's got a plan to do that, but how it plans has been left to the Bureau's discretion by Congress. Congress simply said, meet your existing obligations, and that existing obligation Who's Peggy Monza? She is a Bureau of Reclamation employee. Did she say your plan won't work? She said that the projections that were run with a model on the interim operations plan, that if you assume that water conditions will be like they were in the last 71 years, and if you assume that the model is, that the plan is strictly adhered to, that there would be violations of the salinity standard in a certain percentage of months. All kinds of months. I mean, it's not de minimis as far as I read her declaration. It would be 16 percent of the irrigation season months. And you're talking about salinity going into agricultural land that would wipe out the agricultural land. I'm talking about going above the .7 EC limit, which would be harmful to agriculture. If I were in their shoes, and I read Peggy Monza's thing, I'd be worried about the viability of my land in the future and wondering about your plan. Well, as we've explained, and as the district court understood, that assumes that the Bureau will adhere strictly to that interim operations plan, and that it doesn't have any flexibility to make the changes that are needed to prevent violations. In fact, it has a lot of flexibility, so that... Explain that for me. Well, there are a number of things it can do. If it looks like there's going to be a problem, it can start taking water away from the water service contractors. The contracts have provisions in them that say in drought periods, the Bureau can give them less water. That's one thing it can do. It can take water from stored water, from its carryover water, and use that. It can purchase water and use that. So there are a number of things that the Bureau can do to make sure that it doesn't violate the salinity standards. Have you ever had to do them? It is obligated to meet that standard, yes. Has the Bureau committed itself to violating its plan in order to meet the salinity standard, if necessary? The deposition testimony that were introduced by Mr. Bowling, who is the Bureau of Reclamation Operations Officer, said, yes, they would do what is necessary to avoid violations. And they have. My concern is this. It looks to me as though under the plan, it's pretty foreseeable that sometimes the water is going to be too salty for the farms. It's also plain that the Bureau has the power under the law to see that that problem does not materialize. My concern is, is the Bureau committed and obligated to exercising the power to protect the farms? I can easily imagine Bureau personnel thinking the fish are more important than the farms. It's not going to protect the farms. It's going to take care of the fish. And it would be just as well if there was not so much farming. If Bureau personnel have that philosophy, goodbye farms. And I want to know if the farms are at risk of that philosophy. Well, the Bureau is committed to meeting that obligation. I cannot guarantee you that if there is an extended period of drought, that the Bureau will be able to meet all its obligations. It may be unable to meet fisheries and salinity if we have seven or eight years of drought. The point is that a person can't come into court now, a decade in advance of that possibility happening, and say, I want to get an injunction on how the Bureau is going to plan its day-to-day operations in order to ensure that there's never any risk of a violation of the salinity standards What's the downside to agreeing with the other side and issuing this injunction and declaratory relief? What harm would that cause you if we were to say, this is what you're stuck with? Because then any group could come in and ask for similar relief to protect their interests. The fisheries people could come in and say, we want an injunction to make sure that the Bureau sets aside enough water in New Melonis that we'll always have enough water for fisheries. So to coin a phrase, this is a fluid situation, and you need a lot of latitude. The Bureau does need latitude, and I think the district court recognized that. And if Congress wants to change that situation and to specify that the Bureau has to set aside a certain amount of water, it could do that, but it has not. I guess if Congress has ordered the Bureau to give so much water to the fish, plus to give so much water to the farms, the only way that it could reconcile these conflicting obligations is by ordering God to provide that much water. I mean, the 92 Act. What else can it do? Well, I mean. What else could we do? There is. I think a federal court is not in a very good position to deal with that problem, and I would stress that this is really a state law, I think, concern. What can we do? I'm really asking this seriously. I'm wondering, is it possible to just tell them during what years, store more in the reservoir, so that you have more extra water to deal with dry years for both the fish and the farms? I think it would be deleterious to really get into that, because there are so many considerations that go into determining how much carryover the Bureau should store each year. There are flood control considerations. There are considerations having to do with dissolved oxygen standards downstream. And then there's the fisheries and salinities. It wastes a lot through evaporation too. Right. And so for a court in a case just brought by one of the parties to try and solve the problem, I think threatens a chaotic situation, because there are so many other parties that are going to be affected. So I think that's why Congress has left it up to the Bureau's discretion to do the planning, but the Bureau does have to meet these performance standards, and it intends to do that. I guess that's where I'm hanging up. It has to meet a performance standard of providing at least 800,000 acre-feet off the top for the fish, and it has to meet a performance standard of providing salinity below, I don't know, 0.7 for, I can't keep the name in mind. That's right. But it can't do both if you have seven or eight years of drought, and you've got a plan now where it's foreseeable that about one-sixth of the time it won't do both. Well, when it gets down to that crunch time, the State Water Resources Control Board has said that it is going to enforce this salinity obligation, and so you not only have to State enforce any obligation at all against the Federal Bureau of Reclamation? Yes, because our Written into the law. Yeah, we take our permits under state law, and we're bound by state law for reclamation purposes, and so that's why we're in the State Water Resources Control Board proceeding that Judge Trott The state can step in and make the feds protect the farmers first? Yes, yes, and they say in that decision they will do that. Now, you're absolutely right that the Vernalis standard, which is the only one in contention in this case, the board there said that there is no threat of violation of that standard. The threat there is in regard to three interior delta stations. They're further downstream, and there the conditions are on both the Central Valley project, the federal project, and the state project, so that's a very different issue that's presented in that. There are three possible ways to meet the standards in times of trouble. You can look to contractors and cut that back. You can use stored water, or you could purchase water. Since 1995, have you ever done any of those three in order to satisfy the standard? Yes. In 2002, the Bureau had to, I believe they took water out of the carryover, out of storage, in order to prevent a salinity violation that they kind of saw coming towards them, so they deviated from that 1997 interim operations plan to make sure that they did that. Let me give you the citation for that. If you look in the intervener's supplemental excerpts of record at tab 207, pages 184 to 192, is where Mr. Boling talks about deviating from the plan there in order to prevent a salinity violation. It's somewhat like what General Eisenhower said about war. You can't start a war without a plan, but the minute the war starts, the plan goes out the window after the last term. It's an interim plan. You think it has the flexibility to do the best you can possibly do to satisfy all the interests? That's right. That's correct. And the other side says you're asking us to wait until the land is wrecked. Well, I just don't think that's going to happen because the State has said it's – the State does have authority to step in for threatened violations. That's what we find out about the State's authority from these water resources. That's one thing that indicates, even though there's not a threatened violation at Ronellis, the State thinks there's a threatened violation, or at least the Water Board thinks there's a threatened violation at these three other stations, and so they've stepped in with a compliance order. You've got to deal with threats because once you've ruined the soil and killed the crops, it doesn't do any good to say, oh, you know, we haven't been doing this quite right. We need to give them some more fresh water. And the State doesn't – And what you're doing is conceding that you're as obligated to the Ronellis salinity standard as you are to the fish. Is that right? That's correct. Those are both obligations that we must fulfill. I would point out, though, I think that we may be exaggerating here the salinity problem. It's not one of absolutely destroying the land. There were these salinity violations in the early 90s, and the record shows that the appellants here, in fact, worked with the Bureau and came up with an agreement, basically, that since the violations were in months that they weren't irrigating in, that it was not a problem, that the Bureau did not have to change what it was doing. So we're in communication with all of the stakeholders, including the appellants, and it's not a case where anybody is being threatened with the ruination of their land. Well, has there ever – does the record show there's been a period in recent time when the salinity standard was so high that land was damaged to the point where compensation had to be sought? The record does not show that. There was really – but to be fair, there really wasn't a focus here on retrospective relief. The focus here was really the future, so I don't think anybody introduced evidence of that nature. This was really an attempt to get an injunction to control the Bureau's – how the Bureau planned its operations, and I think the district court recognized that Congress never intended that sort of day-to-day control by courts. I lost your questions. That's all I have. Thank you. I'm Tim O'Loughlin, Your Honors, representing the San Joaquin River Group Authority. I want to answer a couple of questions that were asked a little bit differently. My clients sell B-3 water. We're not part of B-2. B-2 is – Go ahead. Okay. CVPI 3406B-2B-3. Okay, 3406, got you. And the difference is 800,000 is dedicated yield from the Central Valley Project improvement – Central Valley Project. B-3 water is water that's acquired by the Bureau from my clients, and as pointed out in the record, they've had 21 transfers over 600,000 acre-feet. And you received another 28J motion, augmentation, having to do with the recent decision by the 3rd District Court of Appeals, and you're probably wondering why that was sent to you and what relevance it may have to this case. Well, the reason why is my clients, Berced, Modesto, Turlock, Oakdale, and South San Joaquin Irrigation District, when they made these transfers to the Bureau, they went in front of the State Water Resources Control Board, and they said, here are our water rights, here's the water that we're transferring to the Bureau, and we want to change our water rights. And the State Board had a proceeding called D-1641, ending up in Decision D-1641. Well, what was interesting about that decision is the same arguments that were being made at the Federal District were the same arguments that were made at that court, and we're talking legal injury to legal users of water, saline intrusion, the world's coming to an end. The arguments got nowhere. They got nowhere. In fact, they didn't get nowhere, both at the State Water Resources Control Board, at the trial court, and at the 3rd DCA. The legal theories, as well as the factual underpinnings of what the appellants have argued here, were found to be lacking and wanting, and there was no support for them. In fact, one of the key things that Mr. McDaniel left out of the question to, I forget which judge asked it, was what is a riparian entitled to? Well, a riparian is entitled to natural flow. Riparians are not entitled to store water. Now, this is not a big deal in most cases, but in this case it is, because what they're arguing for is they're arguing for releases of water from my client's reservoirs in the summertime that is not riparian water. It's stored water. They have no right to that water. That's why at both the State Board and the trial court and the appellate court found that they had no right to that water. Is there any legal preclusive effect that flows from that decision that you sent us a few days ago? Well, that's one of the ‑‑ it's an interesting question. I was going to ask you, what's the effect of that opinion that you sent us? Well, it's an interesting question as to whether or not maybe part of this case is moot or not. We've had discussions in our office about whether or not parts of this case, and specifically relating to B3, would be moot. So even if it got sent back to the district court, our argument would be is that these matters have already been heard by the State Water Resources Control Board, gone up through trial. Now, I do agree it's at the Third District Court of Appeal. It's currently on petition to the Supreme Court of the State of California. But if it is concluded, that would be the law as applicable to our case in regards to the B3 transfers. Now, that's not applicable to the 800,000 acre feet that's part of the B2 issue. But since that issue, in our view, has already been concluded as well by Judge Wenger's prior approval. How do you calculate riparian rights in the current environment where everything is under control of aqueducts, dams, impoundments? How do you calculate riparian rights? Well, and that's a great question. Actually, it's done by the Department of Water Resources, and they share that information with the State Water Resources Control Board Division of Water Rights. What they do is they... That's some kind of a formula that tells you what the riparian flow is. Yeah, what we do on the San Joaquin River, which is a little bit different than Sacramento, they basically go to the reservoirs at the headwaters, and they take in the daily flow that's coming into the reservoirs, and then they actually give a benefit to the downstream users, and they say that's the flow that would have been at Vernalis. Now, realizing that, like on Millerton, Millerton is 120-some-odd miles from Vernalis. You'd have losses and other uses, but it shows up there. So it is calculated and it is done. The other thing, a couple of quick points before I use up my time. You also asked about the interim plan of operation, and you feel that there's this great threat that's coming based on Peggy Mons' testimony. I should give you a little idea about how the modeling is done and how the interim plan of operation is set up. The interim plan of operation was set up with a forecast with storage that's currently in New Maloney's in February. And then what they do is they forecast how much water is going to come into New Maloney's. They do it on what's called a 90% exceedance, so it's a very conservative standard. And then what we did under the interim plan of operation is that we assigned for the amount of projected inflow and storage, we put a numeric value, and then we assigned a quantity for water quality. So let's say if it's 2.5 million acre-feet, we were going to give them 250,000 acre-feet for water quality. If it's 2 million acre-feet combined, we'd give them 150. If it was a million acre-feet combined, it may have been 75,000 acre-feet, just ballpark numbers. Well, the way the model runs is the model says we're not going to use any more than what's specifically allocated under the IOP when we run the model. So you may have situations, in fact, we pointed this out in our testimony, and this was before the State Water Resources Control Board and before Judge Wenger, is you may have incidents where the model says you have violated the standard, but New Maloney's still may have a million, five acre-feet in it. Because you're locked in by the premise then. Because you're locked in by the premise of the assumption of the modeling, which says you can't exceed that amount. So when the model is running the model, you have exceedances, but in actuality, there was water in storage. And what happened is we found in 2002 and 2003, and this is part of Mr. Bolling's testimony, was in 2002 and 2003, there was going to be projected water quality exceedances over and above the amount that had been allocated to them. So the Bureau said, well, we have plenty of water in storage. We're going to make that water available. Not only that, in 2002 and 2003, which were dry years under the San Joaquin River Basin Index, which is a 60-20-20 index, the CVP contractors, which are Stockton East and Central San Joaquin Water Conservation District, who have contracts of upwards to 155,000 acre-feet from New Maloney's, were not given water in those years under their CVP contracts. And the reason why is under the interim plan of operation, the criteria that was established was to meet objectives first at Vernalis. Okay, that's the overriding consideration is to do that. So in 2002 and 2003, it's in the record as well, those CVP contractors did not receive water. And then two other quick ones. Your time is up. I'm sorry. Oh, I saw that. I didn't see that. I'm sorry. Any questions? Thank you. Okay. For today, the New Maloney's interim operations plan is the plan that the Bureau is using and has been using for the last several years and plans to use in the future. So to me, to say, well, we're not going to follow our plan if there's a problem, what kind of assurance do we have that that's going to happen? I mean, the plan is how you get things done. The plan is how you allocate the 800,000 acre feet. And to just say we're going to throw it out the window if we have to, that's just not a realistic solution. Well, the district court says this ignores the actual operating regime of the CVP, which has consistently met the standards since 94, and that defendants literally manage the CVP on a day-to-day basis. A finite plan, which it sounds to me like that you're asking for, to address specifically the exact water sources for Vernella standards compliance, is neither practicable nor necessary in view of the Bureau's constant adjustment and reallocation throughout each water year. They say that we have ways to deal with this, contractors, stored water, and purchases, and that there is in the record evidence that they have used at least one of those in the past to comply, notwithstanding the modeling problem. What's the problem with that? In fact, they do have a plan, and in fact, that plan is supposed to make provision for the water quality. But the plan is not just the plan. The plan also is part of a procedure and a process that they use, and they have demonstrated they have used successfully to satisfy your concerns. I don't think that's the case. I think the operational is part of the day-to-day discretion in implementing the plan. I think we're talking about, it's like a budget. Congress comes up with a budget every year, and then as things go, maybe the budget isn't completely followed. But at least you know where, at least you have a roadmap where you're supposed to be going. And when the roadmap leads to the wrong place, when the roadmap leads to violations, then we've got a real problem. I think the map, the plan is the map, and then as things develop during the year, then you can make adjustments in order to comply. And I think, in fact, they're required to make those adjustments. Why doesn't that last thing solve your problem? If they just had a plan, and the plan is that every now and then you're going to get overly saline water, that would be a very strong case for the petitioners here. However, the Bureau concedes that it has a legal obligation to assure that the water is not too salty. In view of their concession that they have that legal obligation and the fact that there is such a legal obligation, why isn't that an assurance that they will violate their plan in order to provide the farmers with water that's not too salty? If you ask the Bureau in 1992, 1993, 1994, I'm sure that they would have told you at those times, yes, we have an obligation to meet the Vernalis Standard, but that doesn't mean that they didn't violate it. That's 11 years ago. That's like asking a southern state or saying that the southern states didn't respect people's rights 150 years ago. Why should we trust them now? I mean, the point is, the other side says, if we lock in your interests, then everybody with an interest recognized in this process is entitled to come in for declaratory and injunctive relief also. Isn't that the case, that if we lock yours in, don't we have to lock everybody's in? What's the harm in locking in everybody that is a pre-CVPIA obligation exactly as Congress directed? Well, you know, that answers itself when you read what they were expected to do. And if we lock in yours, doesn't that create a threat to everybody else's? So they'll come in and say, hey, they've been given priority on this, now that threatens ours. And so because we're threatened, now we have standing on injury. That's precisely, though, what the plan is supposed to do. It's supposed to provide for what Congress locked in as the obligations and requirements that were existent in 1992. Congress locked them in, and the Bureau isn't following that requirement. Is there anything that prevents them from going to contractors to find extra water in years where there might be a problem with the standard? No, there isn't. Is there anything that prevents them from using stored water? No, there isn't. Is there anything that prevents them? As long as it's there, because in the previous year when they made their planning, there was sufficient carryover storage into the next year. Is there anything that prevents them from purchasing water? No, provided that the water is available. If they have a legal obligation to give you water that's not too salty, despite what the plan says, why isn't that analogous to my plan is to drive from home to work in 12 minutes, but if there's a train going across the road or there's a dead moose in the road and the police have stopped traffic while they get the moose out of the road, I'm not going to make it in 12 minutes. It's going to take me maybe 18 minutes. And why isn't the plan like that? I mean it's a plan, but they're obligated to violate the plan if the circumstances require a violation in order to give you sufficiently fresh water. The difference is the government has a legal obligation, but Judge Kleinfeld doesn't have a legal right to get home in 12 minutes. I think that's correct. The plan has to be a realistic plan. Is the legal obligation to give you sufficiently pure water, or is the legal obligation to have a long-term plan that assures that you will always have a sufficient supply of non-salty water? The legal obligation is twofold. It's first to comply with the Vernalis standard, and second, it's to operate, to implement the CVPIA in the manner that Congress dictated, which was comply with the 1992 existing obligations and add 800,000 acre feet to that. Well, the way you've described those legal obligations, it's a legal obligation to provide pure water, not a legal obligation to have a plan adequate to provide pure water, if I understood you right. Did I? You did, but the CVPIA – The legal obligation runs to the water, not the plan. The legal obligation does run to the water, but the obligation under the CVPIA is that – So my plan is – your plan that you're fighting is just like what Judge Ferguson described as my plan, something with no legal force, just a plan. It's an operational plan that the Bureau is using in its day-to-day affairs. That's the plan that they're utilizing, but it's a plan that's destined for failure. It's a plan that doesn't comply with the legal requirements of the CVPIA. Thank you, counsel.  We submit Central Delta Water Agency v. Bureau of Reclamation, and we are adjourned until 9 a.m. tomorrow.
judges: Ferguson, Trott, Kleinfeld